UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHAEL KAPLAN and
ANITA KAPLAN,

          Plaintiffs,

v.                                        Case No.  8:05-cv-1236-T-24 EAJ

UNITED STATES OF AMERICA,

          Defendant.

_____/

**ORDER**

This cause comes before the Court on Defendant's Renewed Motion to Dismiss or For Summary Judgment (Doc. No. 48, 25, 9), which Plaintiffs oppose (Doc. No. 50, 20, 28).  Since the parties have submitted, and the Court has considered, documents outside of the complaint, the Court will treat the motion as a motion for summary judgment.

**I.  Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on

any claim.  See id.  When a moving party has discharged its burden, the non-moving party must

then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to

interrogatories, and admissions on file," designate specific facts showing there is a genuine issue

for trial.  Id. at 324.

In determining whether the moving party has met its burden of establishing that there is

no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the

Court must draw inferences from the evidence in the light most favorable to the non-movant and

resolve all reasonable doubts in that party's favor.  See Samples on behalf of Samples v. City of

Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  Thus, if a reasonable fact finder evaluating the

evidence could draw more than one inference from the facts, and if that inference introduces a

genuine issue of material fact, then the court should not grant the summary judgment motion.

See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir.

1988).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury

could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).

## II.  Background

Plaintiffs Michael and Anita Kaplan filed the instant suit for a refund of income taxes in

connection with their 2001 federal income tax return.[1]  Specifically at issue is a theft loss

deduction claimed by Plaintiffs relating to their investments with Reed Slatkin.

### Slatkin's Ponzi Scheme

From 1986 until May of 2001, Reed Slatkin operated an elaborate Ponzi scheme in

---

[1]Plaintiffs also asserted an alternative protective claim (Count II of their complaint), but Plaintiffs have stated that they are not pursuing this claim.  (Doc.  No. 20, p. 2, n.1)

California.  Slatkin portrayed himself as an investment advisor and money manager and accepted

funds from individuals for the stated purpose of investing the funds for them.  On March 26,

2002, Slatkin pleaded guilty to fifteen felony counts and admitted to operating a Ponzi scheme.

In his plea agreement, Slatkin admitted the following: (1) that he did not use the vast majority of

investor funds to purchase securities and cash instruments as was represented on account

statements; instead, he disbursed these funds to other investors as fraudulent returns, diverted

funds for his own personal benefit, and dissipated funds on many speculative, undisclosed, and

ultimately unprofitable investments in which he had a beneficial interest; (2) that he would

fabricate the percentage of return that was represented to investors and would devise a false

trading history for various securities; and (3) because his investments did not generate sufficient

income to meet the investors' periodic requests for payments, he used newly invested funds from

some investors to pay other investors.  See In re Slatkin, 310 B.R. 740, 749 (C.D. Cal. 2004);

Doc. No. 9, Ex. 2).

During the fifteen year period that he operated the Ponzi scheme, Slatkin received

approximately $593 million from over 800 investors.  Approximately seventy-five of the

investors realized substantial profits (totaling at least $151 million) through the Ponzi scheme

("net winner investors").  The majority of the investors, however, lost most, if not all, of the

funds that they had invested ("net loser investors").  The losses of the net loser investors totaled

over $200 million.

From September of 1992 through October of 2000, Plaintiffs transferred $5.7 million to

Slatkin.  (Doc. No. 9, Ex. 7).  Plaintiffs contend that Slatkin reported to them that their

investments with him had yielded over $7.5 million of income.  (Doc. No. 9, Ex. 8).  Plaintiffs

reported this income on their federal income tax returns for the 1992 through 1999 tax years.  In November of 2000, Plaintiffs became aware of Slatkin's Ponzi scheme and demanded the return of their money, plus the earnings thereon.  Slatkin did not return Plaintiffs' money.

### Slatkin's Bankruptcy

In May of 2001, Slatkin filed for bankruptcy.  (Doc. No. 9, Ex. 12).  On July 23, 2001, the bankruptcy trustee filed bankruptcy schedules of Slatkin's assets and liabilities on behalf of Slatkin.  (Doc. No. 9, Ex. 17).  However, the trustee advised that his ability to prepare the schedules accurately and completely was impeded because (1) Slatkin had not cooperated in the preparation of the schedules; (2) the trustee had limited time to review over 330 boxes of records obtained from Slatkin and others; (3) the trustee was unable to review approximately 40 boxes of documents seized by the FBI relating to Slatkin's activities; and (4) the trustee believed that the records that he was able to review were not fully accurate.  (Doc. No. 9, Ex. 17).  The trustee estimated at that time that the claims against the bankruptcy estate totaled between $250 and $500 million.  (Doc. No. 9, Ex. 17).

Plaintiffs filed three proofs of claim in the bankruptcy proceeding–one on July 21, 2001, one on November 28, 2001, and one on December 20, 2001.  (Doc. No. 9, Ex. 7).  The first two proofs of claim filed by Plaintiffs were based on the loss of the money that they invested with Slatkin, plus the earnings thereon.  (Doc. No. 9, Ex. 7).  On March 13, 2003, Plaintiffs withdrew the first two proofs of claim, and the bankruptcy court allowed Plaintiffs' third proof of claim in the amount of $5.7 million for the loss of the money that they had invested with Slatkin.  (Doc. No. 9, Ex. 7).

On October 10, 2002, the trustee estimated that the amount of recovery that could

4

reasonably be expected by creditors in the bankruptcy as of December 31, 2001 was 20.92%.

(Doc. No. 20, Ex. 1).  The trustee stated that his estimate was based on information available as

of December 31, 2001.  (Doc. No. 20, Ex. 1).  Additionally, the trustee stated:

> The estimated recovery . . . is not the Trustee's estimate for final recovery in the
> estate.  There are a number of unresolved factors that could either increase or
> decrease that final estimate and the Trustee is not prepared, at this time, to
> provide such an estimate.  He will do so at the appropriate time and in
> conjunction with a Plan and Disclosure Statement.

(Doc. No. 20, Ex. 1).

## Plaintiffs' Theft Loss Deduction

In the instant action, Plaintiffs claimed a theft loss deduction on their 2001 tax return for

the loss of the money that they had invested with Slatkin, the earnings thereon from 1992-1999,

and the taxes paid on those earnings from 1992-1999.  Specifically, Plaintiffs calculate their

initial theft loss as follows[2]:

Funds Transferred to Slatkin: $5,900,200[3]

Income Allegedly Earned on Purported Investments with Slatkin from 1992-1996: $519,157

Taxes Paid on Income Allegedly Earned from Slatkin Investments from 1992-1996: $167,953

Income Allegedly Earned on Purported Investments with Slatkin from 1997-1999: $3,617,276

Taxes Paid on Income Allegedly Earned from Slatkin Investments from 1997-1999: $958,014[4]

Total Initial Theft Loss: $11,162,600

---

[2]Doc. No. 9, Ex. 46B

[3]Plaintiffs initially asserted that they transferred $5,900,200 to Slatkin, but they later
concluded that they only transferred $5,700,000 to Slatkin.  (Doc. No. 9, Ex. 7, 8).

[4]$220,846 in 1997; $281,480 in 1998; and $455,688 in 1999

**Plaintiffs' Prior Refund Actions**

Prior to filing the instant refund action, Plaintiffs had filed two other refund actions. Specifically, in August of 2002, Plaintiffs filed their first refund action[5], seeking a refund of income taxes paid for the tax years 1997 though 2000, which included income that they had thought that they had earned from their investments with Slatkin from 1997-1999, but which they stated was actually based entirely upon the false information reported to them as part of Slatkin's Ponzi scheme. (Doc. No. 9, Ex. 41, ¶ 36, 42, 48). Furthermore, Plaintiffs stated in their complaint in the first refund action that they did not earn any income relating to their purported investments with Slatkin in 1997-1999. (Doc. No. 9, Ex. 41, ¶ 37, 43, 49). Alternatively, Plaintiffs alleged in their complaint in the first refund action that they were entitled to a refund of taxes paid for the tax years 1997 through 2000 because they were entitled to take a theft loss deduction of $11,162,600 in 2000 for the losses that they sustained in connection with the Ponzi scheme.

In July of 2003, Plaintiffs and the United States settled the first refund action. (Doc. No. 9, Ex. 44). Specifically, the parties agreed that Plaintiffs would be refunded the taxes that they paid on income that they had thought that they had earned from their investments with Slatkin from 1997-1999, resulting in a refund of taxes paid totaling $958,014 as follows: $220,846 for 1997, $281,480 for 1998, and $455,688 for 1999, plus statutory interest. (Doc. No. 9, Ex. 44). Additionally, Plaintiffs agreed to withdraw their claims relating to the 2000 tax year. (Doc. No. 9, Ex. 44). Thereafter, the parties filed a stipulation for dismissal of the first refund action with prejudice. (Doc. No. 9, Ex. 45).

---

[5]Case No. 8:02-cv-1517-T-17-EAJ

6

Thereafter, on July 24, 2003, Plaintiffs filed a second refund action, seeking a refund of income taxes paid for the tax years 1996, 1997, 1998, and 2001 on the grounds that they were entitled to claim a theft loss deduction in 2001 relating to the losses that they sustained due to Slatkin's Ponzi scheme[6] and then carry back the net operating loss resulting therefrom to tax years 1996-1998.[7]  (Doc. No. 9, Ex. 46).  In June of 2004, Plaintiffs and the United States mediated the second refund action, and the parties agreed to a dismissal of the second refund action without prejudice in order to allow Plaintiffs an opportunity to resolve their refund claims on an administrative basis with the IRS.  (Doc. No. 9, Ex. 47).

### Plaintiffs' Resulting Theft Loss Claim

In the instant action, Plaintiffs contend that they are entitled to claim a theft loss deduction of over $6 million in 2001.  (Doc. No. 1, ¶ 41).  This amount can be explained as follows:

Total Initial Theft Loss (as explained above): $11,162,600[8]

Less Income Removed by the Settlement in the Second Refund Action: $3,617,276[9]

Less Refund of Taxes Paid on the Income Removed By the Settlement: $958,014

---

[6]The losses consisted of the income that Slatkin reported to them and the taxes they paid thereon for the tax years 1992-1996, plus the amount of money that they originally invested with Slatkin.

[7]Case No. 8:03-cv-1546-T-24-EAJ

[8]This is based on the assumption that Plaintiffs transferred $5,900,200 to Slatkin, rather than $5,700,000.

[9]The Court notes that Plaintiffs allege this amount to be $3,547,112 in the complaint. (Doc. No. 1, ¶ 40).  However, Plaintiffs set forth the amounts that make up this figure in their attachment to their Form 1040X, which total $3,617,276.  (Doc. No. 9, Ex. 46B).  The Court assumes that the calculation set forth in their attachment to their Form 1040X is the correct calculation.

Total Net Theft Loss Deduction: $6,587,310[10]

However, the net theft loss deduction should be reduced by an additional $200,200 due to

Plaintiffs apparently conceding to the bankruptcy court that they only transferred $5,700,000 to

Slatkin, not $5,900,200.[11]   Thus, it appears that the net theft loss deduction that Plaintiffs are

claiming is $6,387,110.  Explained differently, Plaintiffs are seeking a theft loss deduction based

on the following:

Funds Transferred to Slatkin: $5,700,000

Income Allegedly Earned on Purported Investments with Slatkin from 1992-1996: $519,157

Taxes Paid on Income Allegedly Earned from Slatkin Investments from 1992-1996: $167,953

Total Net Theft Loss Deduction: $6,387,110

### Plaintiffs' Application for a Refund

Plaintiffs initially filed their 2001 tax return, reporting a $650 tax liability.  (Doc. No. 9,

Ex. 49).  On the original 2001 tax return, Plaintiffs did not claim a theft loss deduction.  (Doc.

No. 9, Ex. 49).  In June of 2002, Plaintiffs filed an amended 2001 tax return, in which they

claimed a theft loss deduction of $10,962,400.[12]  (Doc. No. 9, Ex. 50).  In June of 2002,

Plaintiffs filed a Form 1045 Application for Tentative Refund based on the newly claimed theft

loss deduction on their amended 2001 tax return.  (Doc. No. 9, Ex. 51).  Specifically, Plaintiffs

---

[10]Plaintiffs allege that this amount should be $6,657,474 based on the lesser amount of income that they claim is excluded due to the settlement of the second refund action.

[11]Plaintiffs also state that $5,700,000 was the amount they transferred to Slatkin (rather than $5,900,200) in their theft loss calculation filed with their amended 2001 tax return.  (Doc. No. 9, Ex. 50).

[12]This amount represents the initial theft loss amount (explained previously) based on $5,700,000 of funds transferred to Slatkin, rather than $5,900,200 transferred to Slatkin.

claimed that the theft loss deduction resulted in a net operating loss in 2001 that was eligible for carryback to the tax years of 1998 through 2000, resulting in a refund of income taxes.  (Doc. No. 9, Ex. 51).

Plaintiffs claim that they filed an amended Form 1045 Application for Tentative Refund in September of 2002 to revoke their three-year carryback election and instead elect a five-year carryback period.  In order to elect the five-year carryback period, Plaintiffs were required to file the amended Form 1045 Application for Tentative Refund by October 31, 2002.[13]

Plaintiffs sent their amended Form 1045 Application for Tentative Refund via certified mail to the following address: Internal Revenue Service, P.O. Box 105093, Atlanta, GA 30348-5093.  (Doc. No. 9, Ex. 53).  However, the certified mail receipt shows that the document was delivered to the Bank of America, not to the IRS.  (Doc. No. 9, Ex. 53).  Furthermore, the certified mail receipt shows that the document was mailed to the wrong address;[14] the correct mailing address was: Internal Revenue Service, Atlanta, GA 39901-0002.  (Doc. No. 20, Ex. 2; Doc. No. 9, Ex. 54, 55).  On May 24, 2005, the IRS disallowed Plaintiffs' 2001 theft loss deduction.  (Doc. No. 9, Ex. 56).

### III.  Law Regarding Theft Loss Deductions

"Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deductions claimed."  Blodgett v. C.I.R., T.C. Memo. 2003-212 (U.S. Tax Ct. 2003), aff'd, 394 F.3d 1030 (8th Cir. 2005)(citations omitted).  "The taxpayer is required to identify each deduction available and show that all requirements have been met."  Id. (citation

---

[13]Rev. Proc. 2002-40.

[14]The address Plaintiffs used is the address a taxpayer uses if the taxpayer is enclosing a payment.  (Doc. No. 20, Ex. 2).

omitted).  As such, Plaintiffs bear the burden of proving their entitlement to the theft loss

deduction.  See Jeppsen v. C.I.R., 128 F.3d 1410, 1418 (10th Cir. 1997)(citations omitted).

Pursuant to 26 U.S.C. § 165(a), a taxpayer is "allowed as a deduction any loss sustained

during the taxable year and not compensated for by insurance or otherwise."  This includes

losses due to theft.[15] 26 U.S.C. § 165(c)(3).  Theft losses are "treated as sustained during the

taxable year in which the taxpayer discovers such loss."  26 U.S.C. § 165(e).

In order for a theft loss deduction to be allowed, the loss must be evidenced by a closed

and completed transaction.  26 C.F.R. § 1.165-1(b).  The treasury regulations explain:

> Any loss arising from theft shall be treated as sustained during the taxable year in
> which the taxpayer discovers the loss . . ..  However, if in the year of discovery
> there exists a claim for reimbursement with respect to which there is a reasonable
> prospect of recovery, no portion of the loss with respect to which reimbursement
> may be received is sustained, for purposes of [the theft loss deduction] . . ., until
> the taxable year in which it can be ascertained with reasonable certainty whether
> or not such reimbursement will be received.

26 C.F.R. 1.165-1(d)(3).  Additionally, the treasury regulations provide:

> Whether a reasonable prospect of recovery exists with respect to a claim for
> reimbursement of a loss is a question of fact to be determined upon an
> examination of all facts and circumstances.  Whether or not such reimbursement
> will be received may be ascertained with reasonable certainty, for example, by a
> settlement of the claim, by an adjudication of the claim, or by an abandonment of
> the claim.  When a taxpayer claims that the taxable year in which a loss is
> sustained is fixed by his abandonment of the claim for reimbursement, he must be
> able to produce objective evidence of his having abandoned the claim, such as the
> execution of a release.

26 C.F.R. 1.165-1(d)(2)(i).  Furthermore, the treasury regulations provide:

> If in the year of the [theft] . . .  a portion of the loss is not covered by a claim for

---

[15]Whether acts constitute "theft" for purposes of the theft loss deduction must be
determined under state law.  See Riet v. C.I.R., T.C. Memo. 1989-494 (U.S. Tax Ct.
1989)(citations omitted).

reimbursement with respect to which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the [theft] . . . occurs.

26 C.F.R. 1.165-1(d)(2)(ii).

Thus, based on the above, in order for a taxpayer to be entitled to take a theft loss deduction in a given tax year, the taxpayer must show that the theft loss was sustained in that tax year, i.e., the facts must show that as of the end of the tax year at issue, it was reasonably certain that the taxpayer had no reasonable prospect of recovering the amount of the loss that the taxpayer attempted to deduct.  Stated differently, if at the end of the tax year at issue, a claim for reimbursement with a reasonable prospect of recovery exists, then the portion of the theft loss for which there is a claim for reimbursement will not be considered to be sustained at that time, and it will not be deductible until the tax year in which it is determined with reasonable certainty that such reimbursement will not be obtained.  See Jeppsen, 128 F.3d at 1414 (citing Rainbow Inn, Inc. v. C.I.R., 433 F.2d 640, 643-44 (3d Cir. 1970)).  Furthermore, if a taxpayer's prospect of recovery was simply unknowable at the end of the tax year at issue, then the taxpayer will not be entitled to take the theft loss deduction that year.  See id. at 1418; Wagner v. U.S., 2003 WL 691029, at *2 (M.D. Fla. Jan 21, 2003), aff'd, 90 Fed. Appx. 387 (11th Cir. 2003).

"'A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor.'"  Jeppsen, 128 F.3d at 1418 (quoting Ramsay Scarlett & Co. v. C.I.R., 61 T.C. 795, 811 (U.S. Tax Ct. 1974)).  "The 'reasonableness' of a taxpayer's prospect of recovery is primarily tested objectively, although a court may consider to a limited extent evidence of the taxpayer's subjective contemporaneous assessment of his own prospect of

11

recovery." Id. (citations omitted).

The determination of whether a reasonable prospect of recovery exists as of the end of the tax year is a question of foresight, not hindsight. See id. at 1416 (citing Parmelee Transportation Co. v. United States, 351 F.2d 619, 628 (1965)).  As such, the Court cannot consider facts not reasonably foreseeable as of the close of the tax year at issue.  See id. Therefore, "a taxpayer's ultimate recovery does not *control* whether, at the end of a taxable year, that taxpayer enjoyed a reasonable prospect of recovering property stolen during that taxable year." Id. at 1415.  Instead, "ultimate recovery is irrelevant if it was not reasonably foreseeable by the end of the pertinent tax year." Id. (citing Ramsay Scarlett, 61 T.C. 795).  Furthermore, whether a reasonable prospect of recovery exists "'is not to be viewed through the eyes of the "incorrigible optimist," and hence, claims for recovery whose potential for success are remote or nebulous will not demand a postponement of the deduction.'" Id. (citing Ramsay Scarlett, 61 T.C. at 811-12).

Courts have stated "that the fact that a taxpayer *files* a lawsuit may give rise to an inference that the taxpayer has a reasonable probability of recovering his loss." Id. at 1418 (citations omitted).  As one court has stated:

> [T]he fact that a taxpayer, in a given tax year, contemplates filing a suit to recover his losses may be considered in the mix of evaluating whether the taxpayer has a reasonable prospect of recovery.  However, like any other subjective factor, this inference should not control the outcome of the case. . . . [T]he primary analysis of whether there is a reasonable prospect of recovery on a claim for reimbursement of loss is an objective one.

Id. at 1419 (internal citation omitted).  On the other hand, another court has stated that while the filing of a lawsuit may create the inference of a reasonable prospect of recovery, such an

inference does not necessarily arise from the filing of a proof of claim in a bankruptcy case.  See Jensen v. C.I.R., T.C. Memo. 1993-393 (U.S. Tax Ct. 1993)(stating that the filing of a proof of claim is merely a ministerial act that does not require the same degree of effort as pursuing a lawsuit).

"[T]he mere existence of a 'possible' claim or pending litigation will not alone warrant postponing loss recognition;" instead, "the inquiry should be directed to the probability of recovery as opposed to the mere possibility."  Parmelee, 351 F.2d at 628.  Furthermore, a theft loss deduction "need not be postponed where the financial condition of the party against whom the claim is filed is such that no recovery could be expected."  Premji v. C.I.R., T.C. Memo. 1996-304 (U.S. Tax Ct. 1996)(citing Jeppsen v. C.I.R., T.C. Memo. 1995-342 (U.S. Tax Ct. 1995); Jensen, T.C. Memo. 1993-393); see also Estate of Wagner v. C.I.R., T.C. Memo. 1998-338 (U.S. Tax Ct. 1998)(citation omitted).

## IV.  Motion for Summary Judgment

Defendant United States of America moves for summary judgment, arguing: (1) Plaintiffs are not entitled to claim a theft loss deduction in 2001 for the $5.7 million that they transferred to Slatkin, because they cannot show that it was reasonably certain as of December 31, 2001 that there was no reasonable prospect of recovering those funds; (2) Plaintiffs cannot claim a theft loss deduction for the income allegedly earned on purported investments with Slatkin from 1992 through 1996 (referred to by Defendant as "phantom income"), because there is no evidence that such income ever existed; and (3) Plaintiffs cannot claim a theft loss deduction for federal income taxes that they paid on the phantom income allegedly earned from 1992 through 1996, because no theft of those taxes occurred.  Accordingly, the Court will

address each argument.

### A. $5.7 Million Transferred to Slatkin

Defendant first argues that Plaintiffs are not entitled to claim a theft loss deduction in 2001 for the $5.7 million that they transferred to Slatkin, because they cannot show that it was reasonably certain as of December 31, 2001 that there was no reasonable prospect of recovering those funds.[16]  Specifically, Defendant points out that by December 31, 2001, the trustee was in the early stages of identifying the assets of the bankruptcy estate,[17] and the amount of claims against the estate was unknown because the period for filing proofs of claim had not yet expired.[18]  Therefore, Defendant argues that the prospect of recovery was simply unknowable as of December 31, 2001, and as such, Plaintiffs cannot claim a theft loss deduction in 2001.  See Jeppsen, 128 F.3d at 1418; Wagner, 2003 WL 691029, at *2.

Plaintiffs respond that as of December 31, 2001, there was no reasonable prospect of recovering the $5.7 million that they transferred to Slatkin.  Plaintiffs base this on the following: (1) their Slatkin related losses were uninsured; (2) as of December 31, 2001, they had recovered nothing; (3) as of December 31, 2001, the trustee was not optimistic about the amount creditors would recover from the bankruptcy estate, which he estimated to be 20.92%; (4) media articles

---

[16]Defendant does not dispute that Slatkin stole the $5.7 million of funds that Plaintiffs transferred to him.  Instead, Defendant disputes that the loss was "sustained" in 2001.  (Doc. No. 9-2, p. 8, 14)

[17]The assets of the bankruptcy estate included interests in property that the trustee could recover under provisions of the bankruptcy code and state law, including fraudulent transfers to net winner investors for amounts that they received in excess of the amounts that they had invested.  (Doc. No. 9, Ex. 13, p. 67, 89-92).

[18]The initial bar date for filing proofs of claim was February 28, 2002.  (Doc. No. 9, Ex. 14, p. 34)

14

suggested the prospects for Slatkin investors were bleak; (5) Plaintiffs were unsecured creditors

of the bankruptcy estate among 800 other investors, and as of December 31, 2001, a

determination as to whether their claim would be allowed had not been made; (6) the trustee

stated in his First Interim Report on December 31, 2001 that the net loser investors' claims were

approximately $255 million, but the trustee estimated that the tangible personal property and real

property owned by the estate was approximately $30 million;[19] (7) Plaintiffs did not know in

2001 that they had a potential claim against the banks that had assisted Slatkin in the operation

of the Ponzi scheme;[20] and (8) IRS offices on the west coast of the United States were allowing

net loser investors to take theft loss deductions in 2001.

The Court finds that Plaintiffs have not made a sufficient showing to support their

contention that there was no reasonable prospect of recovering the $5.7 million as of December

31, 2001. To begin with, the Court finds that under the facts of this case, Plaintiffs' filing of the

proofs of claim in the bankruptcy case gives rise to an inference of a reasonable prospect of

recovery in 2001.

Furthermore, Plaintiffs' reliance on the trustee's estimation that as of December 31,

2001, the creditors' recovery would be approximately 20.92% to show that there was no

reasonable prospect of recovery is misplaced. Instead, the trustee's estimate shows that there

was a reasonable prospect of *some* recovery of the $5.7 million, although the specific amount of

---

[19]Doc. No. 9, Ex. 13, p. 27, 68.

[20]In September of 2002, the bankruptcy trustee sued to recover over $250 million from
various banks on the grounds that the banks assisted Slatkin in the operation of the Ponzi
scheme. (Doc. No. 9, Ex. 18). Plaintiffs joined as plaintiffs in the bank litigation on their own
behalf and on behalf of others similarly situated.

such recovery could not be determined with reasonable certainty.  See Johnson v. U.S., 74 Fed.

Cl. 360, 366 (Fed. Cl. 2006)(finding that an estimate of the amount that the plaintiff would likely

recover was relevant to the issue of whether there was a reasonable prospect of recovery, but that

the estimate was not sufficient to show, with reasonable certainty, the amount that would be

recovered).  In addition to the fact that the trustee's report only indicated an *estimate* of the

amount that Plaintiffs might recover, the trustee stated in the report that the estimated recovery

of 20.92% was not his estimate for *final recovery*, because there were a number of unresolved

factors that could either increase or decrease that final estimate.  Therefore, at best, the trustee's

report shows that the amount that Plaintiffs would not be able to recover was unknown, and thus,

could not be determined with reasonable certainty as of December 31, 2001.  See id. at 366

(finding that a theft loss deduction based on an estimate of the plaintiffs' ultimate recovery

before the recovery process was resolved was premature and could not be sustained)

      Likewise, Plaintiffs' reliance on the trustee's First Interim Report of December 31, 2001

to show that they had no reasonable prospect of recovery because the estimated value of claims

exceeded the estimated value of the assets is misplaced.  The trustee stated in the First Interim

Report that he had not completed his investigation into Slatkin's assets, and therefore, he stated

that it was premature to make a meaningful estimate as to their value.[21]  At best, the trustee's

First Interim Report shows that Plaintiffs' prospect of recovery was unknown as of December

31, 2001.  See id. at 366 n.6 (disallowing theft loss deduction and noting that the plaintiffs had

not completed their investigation of the assets of the person that they were suing for the theft at

the time that they took the theft loss deduction).

---

[21]Doc. No. 9, Ex. 13, p. 68.

Additionally, Plaintiffs' reliance on the fact that as of December 31, 2001, a determination as to whether their claim in the bankruptcy proceeding would be allowed had not been made is also misplaced.  Again, such does not show that there was no reasonable prospect of recovery as of December 31, 2001; instead, it shows, at best, that Plaintiffs' prospect of recovery was unknown as of December 31, 2001.

Additionally, Plaintiffs' reliance on the fact that they did not know in 2001 that they had a potential claim against the banks that assisted Slatkin is misplaced.  As long as the facts underlying the basis of the claims against the banks existed in 2001, the Court can consider the possibility of Plaintiffs recovering some of their losses from the banks.  See Premji, T.C. Memo. 1996-304; Qureshi v. C.I.R., T.C. Memo. 1987-153 (U.S. Tax Ct. 1987).  Furthermore, even disregarding the possibility of Plaintiffs recovering some of their losses from the banks, the fact remains that Plaintiffs' prospect of recovery due to their participation in Slatkin's bankruptcy was, at best, unknown as of December 31, 2001.

Finally, Plaintiffs have not shown that IRS offices on the west coast of the United States were allowing net loser investors to take theft loss deductions in 2001.  Plaintiffs base this assertion on a redacted Office of Chief Counsel Internal Revenue Service Memorandum ("IRS Memo").[22]  Plaintiffs contend that the redacted IRS Memo relates to Slatkin's Ponzi scheme, and Defendant does not appear to dispute this contention.[23]  In the IRS Memo, the author analyzes the issue of whether a taxpayer can claim a theft loss deduction for the funds that they transferred to Slatkin, and if so, in what year.  The author concludes that the loss is a theft loss,

---

[22]Doc. No. 20, Ex. 3

[23]Slatkin's name is deleted from the IRS Memo.

17

and that there are two approaches as to when a taxpayer can deduct such loss.  Specifically, the

author states that one approach is that the IRS can "allow the losses in _____ reduced by the

Trustee's estimated recovery rate to ease tax administration."  (Doc. No. 20, Ex. 3, p.9).

However, the year in which the losses are deductible under that approach is redacted.  The

second approach outlined by the author is "to not allow the loss at all until all of the dust settles

in the Bankruptcy Court, and determine with some specificity the recovery of each individual."

(Doc. No. 20, Ex. 3, p.9).  The author concludes that the second approach is the one that the

office is recommending and that the national office concurs.

Even assuming that the redacted date in the IRS Memo under the first approach is 2001,

there is no evidence that the first approach outlined in the IRS Memo was implemented in the

west coast.  At best, the IRS Memo shows that the IRS was considering two approaches, but it

does not show that it followed the first approach and allowed theft loss deductions in 2001 for

funds transferred to Slatkin.[24]

Plaintiffs also argue that as of December 31, 2001 it was reasonably certain that they

would not recover the entire amount of the $5.7 million that they transferred to Slatkin, and as

such, the vast majority of their $5.7 million loss was sustained in 2001.  Even if the Court

accepts as true that it was reasonably certain as of December 31, 2001 that Plaintiffs would not

recover the *entire* $5.7 million that they transferred to Slatkin, the fact remains that the amount

that they had a reasonable prospect of recovering was unknown as of December 31, 2001.

Therefore, it would be mere speculation for the Court to attempt to determine what portion of the

$5.7 million Plaintiffs had no reasonable prospect of recovering as of December 31, 2001, since

---

[24]Plaintiffs also rely on a heavily redacted calculation spreadsheet.  (Doc. No. 20, Ex. 4).
However, there has been no showing that this calculation was used by the IRS.

the recovery process was not completed at that time.

Accordingly, the Court finds that Plaintiffs have not shown that as of December 31, 2001 it was reasonably certain that there was no reasonable prospect of recovering the $5.7 million that they transferred to Slatkin.  Instead, the Court finds that, at best, the facts show that Plaintiffs' reasonable prospect of recovery as of December 31, 2001 was unknown, and as such, they were not entitled to claim a $5.7 million theft loss deduction in the 2001 tax year.

**B. Phantom Income**

Next, Defendant argues that Plaintiffs cannot claim a theft loss deduction for the loss of the $519,157 in income allegedly earned on purported investments with Slatkin from 1992 through 1996, because there is no evidence that such income ever existed.  Thus, Defendant argues that if there is no evidence that such income ever existed, Plaintiffs cannot show that such income was unlawfully taken (a prerequisite to the theft loss deduction).  See Blodgett, T.C. Memo. 2003-212 (stating that there can be no theft of an asset who existence is not firmly established); Marks v. C.I.R., 390 F.2d 598, 599 (9th Cir. 1968)(stating that a taxpayer cannot take a theft loss deduction for the failure to realize anticipated income).

Plaintiffs respond that the IRS took a different position in the IRS Memo.  Specifically, the author analyzed the issue of whether Slatkin investors incurred a deductible theft loss with respect to the phantom income, and if so, in what year it was deductible.  The author concluded that investors who reported and paid taxes on phantom income could claim a theft loss deduction for the phantom income.  (Doc. No. 20, Ex. 3, p. 7).  With regards to the year in which the theft loss deduction for phantom income could be claimed, the author stated:

If the investors reported phantom income in years now closed by the statute of

19

limitations, they cannot file claims for refund to reverse the reported phantom income.  Furthermore, the investors have no remedy as to these closed years in the pending bankruptcy proceedings as to. [sic] Our office believes that there is a closed and completed transaction in so far as phantom income in closed years. There are no contingent events which might impact further recovery, in so far as the phantom income reported [in] years closed by the statute of limitations. Therefore, this portion of the loss is fixed as being sustained in _____.

(Doc. No. 20, Ex. 3, p. 8).

The year in which the author concludes that a theft loss deduction for phantom income could be taken is redacted.  However, even assuming that the author concluded that the year in which a theft loss deduction for phantom income could be taken was 2001, there is no evidence that the author's conclusion was actually implemented by the IRS.  Therefore, Plaintiffs have not shown that they are entitled to take a theft loss deduction for the loss of the phantom income in 2001.

Next, Plaintiffs argue that there is a genuine issue of material fact regarding whether Plaintiffs actually earned the income that was reported to them by Slatkin.  Specifically, Plaintiffs assert that Defendant has not offered any proof that the income does not exist.  The Court, however, rejects this argument.  The evidence before this Court shows that Slatkin operated a Ponzi scheme and diverted investors' money.  The burden in on Plaintiffs to show that they are entitled to the theft loss deduction, which includes showing that the income actually existed.  Plaintiffs have not submitted any evidence that raises a genuine issue of material fact regarding whether the income reported to them from 1992 through 1996 actually existed. Therefore, Plaintiffs have not shown that they are entitled to claim a theft loss deduction for the phantom income reported to them by Slatkin from 1992 through 1996.

### C.  Taxes Paid on Phantom Income

Next, Defendant argues that Plaintiffs cannot claim a theft loss deduction for the $167,953 in federal income taxes that they paid on the phantom income allegedly earned in 1992 through 1996, because no theft of the taxes occurred.  In order for a taxpayer to claim a theft loss deduction, the taxpayer must show that a theft occurred.  In order for a theft to have occurred, there must have been an unlawful taking.  See Riet, T.C. Memo. 1989-494.

Plaintiffs paid taxes to the IRS on alleged income reported to them by Slatkin for the years 1992 through 1996.  If the income did exist, as alleged by Plaintiffs in connection with their argument that a theft loss deduction should be allowed for the loss of the alleged income, then the taxes paid on such income may or may not have been required,[25] but such payment was not an unlawful taking by the IRS.  If the income did not exist, and there is no evidence before the Court that the income did, in fact, exist, then the payment of income taxes on the income, while unnecessary, did not constitute an unlawful taking by the IRS.  Without an unlawful taking, there can be no theft loss deduction for the taxes paid on the phantom income.  Therefore, the Court finds that Plaintiffs have not shown that they are entitled to claim a theft loss deduction for the $167,953 in federal income taxes that they paid on the phantom income allegedly earned in 1992 through 1996.

### D.  Duty of Equality

The Court notes that Plaintiffs argue that based on IBM Machines Corp. v. U.S., 170 Ct. Cl. 357 (Ct. Cl. 1965), they should be allowed to take the theft loss deduction in 2001.  In IBM,

---

[25]Campana v. C.I.R., 2001 WL 1922684, at *4-5 (U.S. Tax Ct. Sept. 26, 2001)(discussion whether distributions from a Ponzi scheme are taxable).

the court was faced with different tax treatment by the IRS for two direct competitors. Specifically, the IRS had relieved one of the competitors from paying an excise tax on the identical machine produced by the other competitor.  The court found that under the facts of the case, the two direct competitors should both have been treated the same regarding whether the same product was subject to an excise tax.

Courts have limited <u>IBM</u> to the facts of that case.  See <u>USA Choice Internet Service, LLC v. U.S.</u>, 73 Fed. Cl. 780, 797 n.29 (Fed. Cl. 2006)(citing <u>Knetsch v. U.S.</u>, 172 Ct. Cl. 378, 348 F.2d 932 (1965); <u>Bornstein v. U.S.</u>, 170 Ct. Cl. 576, 345 F.2d 558 (1965); <u>Florida Power & Light Co. v. U.S.</u>, 375 F.3d 1119, 1125 (Fed. Cir. 2004)).  As such, Plaintiffs' reliance on <u>IBM</u> is misplaced.  Furthermore, even if <u>IBM</u> were applicable, Plaintiffs have not pointed to any evidence that any of the Slatkin investors that were allowed to take a theft loss deduction in 2001 did not abandon their reimbursement claims by December 31, 2001.  As such, Plaintiffs have not shown that summary judgment should not be granted in this case.

**V.  Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that Defendant's Renewed Motion to Dismiss or For Summary Judgment (Doc. No. 48) is **GRANTED**.  The Clerk is directed to enter judgment in favor of Defendant and to close the case.

**DONE AND ORDERED** at Tampa, Florida, this 15th day of August, 2007.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record